JULIETTE P. WHITE (USB 09616)
ROBERT H. HUGHES (USB 9787)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
ecf@parsonsbehle.com
jwhite@parsonsbehle.com
rhughes@parsonsbehle.com
*Attorneys for Plaintiff UTOPIA*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTAH TELECOMMUNICATION OPEN INFRASTRUCTURE AGENCY, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF AMERICAN FORK, DAVID BUNKER in his official capacity as American Fork City Administrator, and BRAD FROST in his official capacity as American Fork City Mayor <br><br> Defendants. | **COMPLAINT** <br><br> Case No. 2:21-cv-00600 <br><br> Magistrate Judge  Daphne A. Oberg |

Plaintiff Utah Telecommunication Open Infrastructure Agency ("UTOPIA")

alleges as follows:

## PARTIES

1.      Plaintiff UTOPIA is an interlocal entity created pursuant to the Utah Interlocal Cooperation Act, Utah Code Ann. 11-13-101 *et seq*. (the "Interlocal Act").

2.      Defendant City of American Fork ("American Fork" or the "City") is a municipality duly organized and incorporated pursuant to the laws of the State of Utah.

3.      Defendant David Bunker is the City Administrator of American Fork. In that capacity, he is vested with the administrative powers, authority, and duties for the City, including responsibility for administering contracts, and for seeing that all franchises, leases, permits, contracts, licenses, and privileges granted by the City are observed.  The City Administrator reports directly to the Mayor.  Defendant Bunker is sued in his official capacity.

4.      Defendant Brad Frost is the Mayor of American Fork.  In that capacity, he is the chief executive of the City, and is responsible for ensuring that all City laws and ordinances are faithfully executed.  The Mayor oversees the City Administrator. Defendant Frost is sued in his official capacity.

## JURISDICTION & VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action concerns claims arising under federal law, namely, the

4850-8867-0718.v1

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996), 47 U.S.C. § 253.

6.     In addition, this Court has authority to issue declaratory and further necessary and proper relief pursuant to 28 U.S.C. §§ 2201-02.

7.     Venue is proper in the United States District Court for the District of Utah pursuant to 28 U.S.C. § 1391(b) because American Fork is located in this District, the individual defendants are residents of this district, the rights-of-way at issue are located in this District, and all or a substantial part of the events or omissions giving rise to this cause of action took place in this District.

## GENERAL ALLEGATIONS

### A.     UTOPIA

8.     UTOPIA is an interlocal entity formed in accordance with the Interlocal Act, which allows two or more public agencies to enter into an agreement to jointly exercise their authority as a separate and independent legal entity. The members of UTOPIA comprise eleven municipalities from around the State of Utah.

9.     UTOPIA was formed in 2002 for the specific purpose of financing, building, and operating the infrastructure and related facilities necessary to provide high-speed fiber-optic connections directly to residences, businesses, and government agencies (the "Network").

3

10.     While UTOPIA provides the Network, it generally does not provide its customers with the broadband internet service that is required to use the Network. The broadband internet service is typically provided by private internet service providers ("ISPs") that contract with UTOPIA for capacity on the network.

11.     UTOPIA's Network is operated on an open-access basis, meaning that UTOPIA allows all private ISPs equal access to the Network on a non-discriminatory basis.

12.     Many private ISPs — including XMission, Sumo Fiber, and Fiberwave — use UTOPIA's Network to provide services to their customers.  At this time, eleven different ISPs serve Utah residents over UTOPIA's Network, and over twenty-five ISPs serve Utah businesses using UTOPIA's Network.

13.     Some private ISPs do not use UTOPIA's Network, but rather offer internet services over networks that they finance, build, and operate themselves. These include Xfinity, which provides services over a cable network; CenturyLink, which provides services over its own private fiber-optic network; and Google Fiber, which provides services over its own private fiber-optic network.

14.     For private ISPs that do not have the capital to compete directly with companies like CenturyLink and Google to build their own private fiber-optic network, UTOPIA makes it possible for them to provide telecommunications

services.  By using UTOPIA's open-access Network, these smaller private ISPs are able to compete with companies like CenturyLink and Google Fiber in cities throughout the state.

15.    UTOPIA's open access Network connects to residences in fifteen cities throughout Utah.  Some of those municipalities are members of UTOPIA, while others are not.

16.    In addition, UTOPIA's Network connects to businesses in over fifty Utah municipalities.  Some of those municipalities are members of UTOPIA, but most of them are not.

17.    UTOPIA's Network also provides essential high-speed connections to schools and other public agencies in over 30 cities throughout Utah.  Some of those cities are UTOPIA members, while others are not.

18.    UTOPIA holds a "State of Utah Cooperative Contract" with the State Division of Purchasing.   Under the Cooperative Contract, any department, institution, agency, or political subdivision of the State of Utah may contract with UTOPIA to provide fiber optic infrastructure such as ethernet or dark fiber.  As one example, UTOPIA provides Network connectivity pursuant to the Cooperative Contract to the Department of Motor Vehicles Office located in the City of South Salt Lake, which city is not a member of UTOPIA.

19.   ISPs often ask UTOPIA to build new infrastructure connections for customers so that the private ISP may serve those customers by providing high-speed internet services over UTOPIA's Network.  These requests may come from ISPs located in cities that are not members of UTOPIA, but where those ISPs wish to compete with other private providers of telecommunications services by offering high-speed internet services at competitive rates over UTOPIA's open-access Network.

20.   In addition, when a business operating in a city that is not a member of UTOPIA wishes to obtain access to UTOPIA's Network, it may contact UTOPIA and place an order for construction and installation of the infrastructure necessary for an ISP to provide that business with high-speed broadband internet.

21.   Like any telecommunications infrastructure, UTOPIA's Network must, of necessity, be located primarily in public rights-of-way.  Whether fiber-optic cables are strung on poles above ground, or buried in conduits below ground, they must be routed primarily along city streets.  As a result, access to public rights-of-way is essential to building the infrastructure necessary to provide telecommunications services and broadband internet access to residents and businesses in American Fork.

4850-8867-0718.v1

B.   **The Telecommunications Act**

22.   The Telecommunications Act of 1996 imbues telecommunications service providers with a paramount legal right to access public rights-of-way.

23.   Section 253(a) of the TCA provides: "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.  47 U.S.C. § 253(a).

24.   The Telecommunications Act prohibits regulatory action that materially inhibits or limits the ability of any entity to compete in a fair and balanced legal and regulatory environment or impedes the provision of telecommunications services.

25.   Local regulatory activity that has a prohibitory or discriminatory effect by giving an advantage to particular services or facilities runs afoul of the Telecommunications Act and is, therefore, preempted, and unenforceable.

C.   **American Fork's ROW Ordinance and Permitting Process**

26.   The use of American Fork's city streets is governed by Chapter 12 of The Code of the City of American Fork, Utah, ("American Fork Code"), which states:

> "No person, firm, corporation or public entity shall construct any structure, system or facility within the

7

> rights-of-way of any city-owned street without first
> receiving approval of the city council and obtaining a
> permit therefor."

American Fork Code Sec. 12.04.020.

27.    The American Fork Code directs those who want to construct a facility in City streets to "make application to the city council on forms provided by the city." American Fork Code Sec. 12.04.030(A).

28.    The American Fork Code vests all authority over use of the public rights-of-way in the American Fork City Council:

> "If, in the opinion of the council, placement of such
> facilities or systems is in the best interest of the city, and
> will be constructed and maintained without impairment to
> the health, safety and general welfare of the city residents,
> the council may authorize such construction subject to any
> conditions which it deems necessary to mitigate any
> adverse effects of such construction, and issue a permit
> therefor."

American Fork Code Sec. 12.040.030(B).

29.    Finally, the American Fork Code mandates that "All approvals shall be consistent with any existing franchise agreements." American Fork Code Sec. 12.04.040.

30.    In practice, American Fork does not follow the requirements of Chapter 12 of the American Fork Code when issuing permits for the installation of facilities in American Fork streets.

8

4850-8867-0718.v1

31.     For instance, while American Fork Code Sec. 12.04.040 contemplates that some permit applications will not have franchise agreements with the City, in practice American Fork will not issue right-of-way permits to entities that do not have a franchise or right-of-way agreement with the City.

32.     As another example, while American Fork Code Sec. 12.04.030(A) requires those who want to construct a facility in City streets to submit an application to the City Council, in practice the applications are provided by, and submitted to, the City's Public Works department.  Specifically, the City's website directs applicants to submit applications for right-of-way permits to a specific email address (excavationpermits@americanfork.gov), where permits are reviewed by City staff (collectively referred to in the singular as the "Permit Administrator").

33.     Likewise, while American Fork Code Sec. 12.04.030(B) vests the authority to issue right-of-way permits in the City Council, in practice the decision to issue or deny a right-of-way permit is made by City staff.  Specifically, in the normal course of business, individuals in the Public Works department issue or deny permits based on engineering matters — traffic management, safety plans, pavement repair, and other similar concerns.

D.      **The UTOPIA – American Fork Franchise Agreement**

34.     In early 2018, UTOPIA and American Fork began negotiating the terms of a franchise agreement that would allow UTOPIA access to American Fork's public rights-of-way.

35.     In its negotiations with American Fork, UTOPIA was explicit that it intended to install the Network in American Fork for the purpose of serving customers in American Fork.

36.     The American Fork City Council approved the franchise agreement on March 27, 2018, after it had been reviewed and approved by the City Attorney for American Fork, and an outside attorney with telecommunications expertise.

37.     On April 24, 2018, American Fork and UTOPIA executed the franchise agreement, which was titled the Interlocal Cooperation Right of Way Licensing Agreement Between American Fork City and UTOPIA ("ROW Agreement").

38.     The ROW Agreement provided UTOPIA with a non-exclusive license from American Fork to "lay, maintain, operate, repair, inspect, protect, install, remove, and replace fiber optic cable, and other transmission and distribution structures and facilities" within American Fork's rights-of-way.

4850-8867-0718.v1

39.   The ROW Agreement contemplated that UTOPIA would obtain an individual permit from American Fork for each discrete project and set forth terms relating to UTOPIA's access to American Fork's rights-of-way.

40.   For example, the ROW Agreement provided that "Upon compliance with this Agreement and all applicable permit requirements … City shall issue a permit to UTOPIA's contractor, allowing said contractor to proceed with the work in accordance with the terms of this Agreement and the permit."

41.   The ROW Agreement allows UTOPIA to construct and maintain facilities in American Fork regardless of whether they serve business and individuals residing in American Fork or merely enable UTOPIA to serve clients in other municipalities.  Stated differently, the ROW Agreement does not limit the types of customers that UTOPIA may serve in American Fork and does not prohibit UTOPIA from serving customers in American Fork.

42.   The initial term of the ROW Agreement was ten years.

**E.   <u>American Fork Singles Out UTOPIA Permits for Extra Scrutiny</u>**

43.   Almost immediately after the ROW Agreement was signed, American Fork subjected UTOPIA's permit applications to additional review and delay.

44.   For example, in April of 2018, UTOPIA's contractor submitted a permit application to install a fiber-optic network to a new apartment building in the

City (the "Apartment Permit").  On May 16, 2018, the contractor asked the Permit

Administrator about the status of the permit.  The Permit Administrator responded

that Defendant Bunker had asked to review the plans personally.

45.     Two weeks later, the Apartment Permit had still not been issued, which

prompted inquiries from the owner and the legal counsel for the apartment building.

Again, it appeared the delay was due to Defendant Bunker.

46.    On information and belief, UTOPIA is the only permit applicant that

was singled out for a special, additional review by the City Administrator.  That

review is outside the ordinary course of business for American Fork.

47.    On information and belief, this extra scrutiny was not applied to other

telecommunications providers that submitted applications for right-of-way permits.

48.    The extra scrutiny of UTOPIA permits, and accompanying delays,

continued.  On May 15, 2019, Defendant Bunker emailed the Permits Administrator

with the following directive: "All utopia permits need to be reviewed by George

[Schade] and I in the future."

49.    On July 18, 2019, George Schade emailed the Permits Administrator

with this information about a UTOPIA permit: "I just received a call from David

Bunker and he wants us to hold off on issuing this permit.  He is going on vacation

next week and when he returns we will discuss the issuance of this permit at that time."

50.    One month later, on August 6, 2019, Defendant Bunker reiterated: "And I still need to review the details for any UTOPIA permit. So at this point we would not issue any permits for them."

51.    By the end of 2019, there were internal discussions at the City about whether to terminate the ROW Agreement with UTOPIA. The Permit Administrator forwarded a UTOPIA application to George Schade and David Bunker, with an inquiry: "Here is a Utopia permit application. Did we cancel the franchise agreement with Utopia?"

52.    In January of 2020, the Defendants Bunker and Frost were still deciding what to do about UTOPIA, as evidenced by this email from Bunker to Frost: "We received another permit application from UTOPIA. We spoke about this briefly but we need to decide what the direction will be going forward."

53.    While Defendants Bunker and Frost deliberated, the extra scrutiny of UTOPIA permit applications continued. The Permit Administrator responded to another inquiry from UTOPIA's contractor as follows: "The permit application is being reviewed by our City Administrator, David Bunker. Please reach out to him concerning the status of your permit."

54.     In January, February, March, and May of 2020, UTOPIA raised its concerns about the permitting delays with American Fork, including Defendant Bunker.

55.     After some correspondence between the parties, on July 14, 2020, American Fork's legal counsel wrote to UTOPIA's General Counsel, explaining that the City would deny certain outstanding permit requests, while approving some others.  American Fork decided to approve only permits involving the construction of backbone transport lines through American Fork to reach other cities.  American Fork denied any permits seeking to build service laterals for UTOPIA customers within American Fork.

56.     The July 14, 2020 letter also notified UTOPIA that American Fork was terminating the ROW Agreement.  No reason for terminating the agreement was offered.

57.     American Fork's refusal to approve permit requests by or for UTOPIA for service laterals for customers within American Fork has harmed UTOPIA, its customers, and the private ISPs who wish to offer services within American Fork using UTOPIA's Network.

58.     In some cases, UTOPIA has been forced to buy capacity from other network providers that are allowed to install infrastructure in American Fork, so that UTOPIA can fulfill existing contracts with its customers.

59.     In other cases, UTOPIA has been forced to cancel existing customer orders for connections within American Fork and has lost significant revenues as a result.   UTOPIA has also recently been forced to cancel or reject over a dozen additional customer orders because UTOPIA is unable, due to American Fork's conduct, to obtain the permits needed to fulfill those orders, and again lost significant revenues as a result.

60.     American Fork's termination of the ROW Agreement continues to harm UTOPIA, its customers, and the private ISPs who wish to offer services within American Fork using UTOPIA's Network by prohibiting UTOPIA from applying for permits in American Fork's rights-of-way to construct its Network.

61.     The ROW Agreement was not the first agreement between American Fork and UTOPIA relating to UTOPIA's Network.   In 2005, the parties entered into an interlocal cooperative agreement to allow UTOPIA to purchase 24 strands of fiber from American Fork on a route that extends from Salt Lake City to Spanish Fork. The purchase was completed in 2008 and facilitated the construction of essential portions of the UTOPIA network in several cities across the state.

62.     In addition, since 2019, American Fork has entered into right-of-way agreements with other telecommunications providers, including Qwest Corporation dba Centurylink and First Digital Telecom, LLC, on terms that are very similar, if not identical to, the ROW Agreement between UTOPIA and American Fork.

63.     American Fork also entered into franchise agreements with other telecommunications providers in recent years, including Veracity Networks, LLC and Syringa Networks, LLC. Those franchise agreements also contained terms that were similar to those found in the ROW Agreement between UTOPIA and American Fork.

64.     Nonetheless, any telecommunications provider that wishes to use UTOPIA's Network to provide high-speed broadband services to residents and businesses in American Fork, rather than build its own, is effectively prohibited from doing so by American Fork's actions.

F.     **Why American Fork _Really_ Scrutinized UTOPIA's Permits and Terminated the ROW Agreement**

65.     In 2018, complaints about the delay in issuing the Apartment Permit reached a City Councilperson, who forwarded the concerns to Defendant Frost.  The Mayor did not provide any reason for holding up the permit based on the plans, the engineering, or traffic management.  Instead, he responded that "David [Bunker] and

16

I have been in communication on this for several weeks and have met with another interested party that might be a better alternative for our residents as a whole."

66.    In early 2019, Defendant Bunker circulated to the Mayor and City Council a "Confidential Proposal" from an entity holding itself out as Sumac International ("Sumac").  Bunker explained that Sumac was proposing a municipal broadband project (the "City Fiber Project") that would be different from other broadband projects such as iProvo, Google, and UTOPIA, which have "not been considered very successful, or even a full on catastrophe."

67.    On information and belief, "Sumac International" was not registered as a business entity with the State of Utah Division of Corporations, or any other state.

68.    On information and belief, the people holding themselves out as Sumac International were Todd Marriott, David Shaw, and Kathy Shaw.  Todd Marriott is the former Executive Director of UTOPIA.  David Shaw, now deceased, is the former General Counsel of UTOPIA.  Kathy Shaw was married to David Shaw.

69.    American Fork did not issue a Request for Proposals, Invitation for Bids, or engage in any public procurement process for the services being proposed by Sumac.

70.    On February 26, 2019, the City Council approved a Master Services Agreement with Sumac.  The minutes of that meeting do not reflect any substantive discussion of Sumac, the Master Services Agreement, or the scope of their work.

71.    On March 12, 2019, the City Council approved an amendment to the Sumac Master Services Agreement, increasing the not-to-exceed amount of the contract to $135,000.   Again, no substantive discussion of the amendment is reflected in the minutes.

72.    In April of 2019, Design Nine, a consulting firm working as a sub-consultant to Sumac, began conducting a study of American Fork residents to gauge interest in a City-wide fiber-optic network to provide broadband internet services. Design Nine also performed a study to estimate the cost of such a system.

73.    On June 6, 2019, a company called "Municonsults, LLC" was registered with the State of Utah Division of Corporations.  The only listed member of Municonsults, LLC is Kathy Shaw.

74.    On information and belief, Municonsults was simply a new name under which Todd Marriott, David Shaw, and Kathy Shaw continued performing the same work they had begun under the name Sumac.

4850-8867-0718.v1

75.    In June of 2019, Sumac and/or Municonsults provided the City with reports, studies, and memoranda regarding the proposed municipal broadband project.

76.    In May of 2019, Mayor Frost formed a four-person citizen "task force" to study options for providing broadband services to American Fork residents.

77.    On June 18, 2019, the citizen task force completed its report (the "Task Force Report").  The Task Force Report recites that the task force members met with three experts: David Shaw, Kathy Shaw, and Todd Marriott.  The Task Force Report does not disclose that the experts were paid consultants for the City.

78.    The Task Force Report recommended that the City Council "seriously consider" issuing bonds in the amount of $30,000,000 to fund the construction of the City Fiber Project.

79.    Also on June 18, 2019, Design Nine – the sub-consultant to Sumac/Municonsults – presented its Market Survey and Cost Study to the City Council at a work session.  A representative of Design Nine spoke favorably about the proposed City Fiber Project.  Todd Marriott also spoke favorably about the project.

4850-8867-0718.v1

80.     Defendant Bunker, the Mayor, and the City Council began discussing the process of issuing bonds to fund the project, the first step of which was to pass a "parameters resolution".

81.     On July 18, 2019, Councilperson Robert Shelton emailed other council members to inquire about soliciting bids for the City Project before passing a parameters resolution.  He notes that David Shaw had recommended soliciting bids, and that UTOPIA had expressed interest in bidding on any such project.  Defendant Bunker forwarded Shelton's inquiry to Todd Marriott and asked "Can we discuss these answers from Mr. Shelton today."

82.     The next day, July 19, 2019, Kathy Shaw emailed "talking points for the council" to Defendant Bunker, and offered a justification for why the City did not need to put the project out to bid – including for the contract that she, David Shaw, and Todd Marriott were working under.

83.     On August 13, 2019, the City Council passed a parameters resolution, authorizing the issuance of $35,000,000 in bonds to fund the City Fiber Project.  At the same meeting, the City Council approved an agreement with Municonsults, with compensation of approximately $140,000.

84.     In September of 2019, the City Council continued to discuss the City Fiber Project with Todd Marriott and Kathy Shaw, including forming a new

Case 2:21-cv-00600-DBB-CMR   Document 2   Filed 10/12/21   PageID.23   Page 21 of 27

interlocal entity called LightHub Communications Agency ("LightHub"), that would include the City of Kaysville along with American Fork. On September 24, 2019, the City Council voted 4-1 to execute a Communications Service Contract with LightHub. Councilperson Shelton was the only council member to vote in the negative. On September 30, 2019, LightHub was registered with the State of Utah as an interlocal entity, with Defendant Bunker listed as the primary contact.

85.     On October 11, 2019, Councilperson Shelton emailed other Council members about the City Fiber Project, and suggested that the City issue a Request for Proposals. He stated that Todd Marriott has "fulfilled his contract to us and that we, as a council, now need to take control…".

86.     American Fork continues to discriminate against UTOPIA, its customers, and the private ISPs that wish to use UTOPIA's Network, and to grant certain large ISPs preferential access and treatment for purposes of building their telecommunications infrastructure in the City.

87.     American Fork's conduct materially inhibits or limits the ability of UTOPIA and the private ISPs that wish to use UTOPIA's Network from competing in a fair and balanced legal and regulatory environment and impedes the provision of telecommunications services in American Fork.

4850-8867-0718.v1

## FIRST CAUSE OF ACTION

### Breach of ROW Agreement Against American Fork

88.    Plaintiff realleges and incorporates by reference the allegations set forth above.

89.    The ROW Agreement was a valid and binding contract between UTOPIA and American Fork.

90.    UTOPIA performed its obligations under the ROW Agreement.  For example, UTOPIA's permit requests complied with the requirements of the ROW Agreement and all applicable City ordinances and were supplemented with necessary information when necessary.

91.    American Fork breached its obligations under the ROW Agreement by refusing to approve or grant many of UTOPIA's permit applications.

92.    American Fork's multiple breaches of the ROW Agreement were material because, for example, the permits requested by UTOPIA were essential to UTOPIA receiving the benefit of its bargain with American Fork, and without the permits UTOPIA would not be able to access American Fork's rights-of-way.

93.    UTOPIA has been damaged in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

**Breach of Covenant of Good Faith and Fair Dealing Against American Fork**

94.    Plaintiff realleges and incorporates by reference the allegations set forth above.

95.    Every contract contains an implied promise that the parties will deal with each other fairly and in good faith.

96.    American Fork breached its obligation to act fairly and in good faith with UTOPIA under the ROW Agreement by refusing to approve or grant UTOPIA's permit applications, and by terminating the ROW Agreement for improper purposes.

97.    UTOPIA has been damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

**Violation of Telecommunications Act, 47 U.S.C. § 253 Against Bunker, Frost**

98.    Plaintiff realleges and incorporates by reference the allegations set forth above.

99.    The TCA precludes any local or state entity from prohibiting, or having the effect of prohibiting, telecommunications service providers from providing services.

100.    Specifically, section 253(a) of the TCA states as follows: "No State or local statute or regulation, or other State or local legal requirement, may prohibit or

23

have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

101.   UTOPIA constructs, operates, and maintains open-access fiber-optic broadband infrastructure that is used by dozens of private ISPs in Utah to serve their customers.

102.   American Fork has refused to allow UTOPIA access to its rights-of-way for purposes of constructing, operating, and maintaining its fiber-optic broadband infrastructure for use by private ISPs with customers in American Fork.

103.   American Fork has refused to grant right-of-way permits requested by UTOPIA and/or UTOPIA's contractors in response to service requests by private ISPs who wish to use UTOPIA's Network to serve their customers in American Fork.

104.   American Fork has approved permit requests and granted right-of-way access for other telecommunications service providers, including Centurylink, Syringa, and Veracity, all of whom are competitors of the companies that wish to use UTOPIA's Network to serve customers in American Fork.

105.   American Fork has entered into ROW agreements with other telecommunications service providers, including Centurylink, Syringa, and

Veracity, all of whom are competitors of the companies that wish to use UTOPIA's fiber-optic network to serve customers in American Fork.

106.  American Fork's refusal to approve UTOPIA's permit applications, and cancellation of UTOPIA's ROW Agreement prohibits, and has the effect of prohibiting, the ability of many entities in Utah to provide fiber-optic broadband telecommunications services to the residents of American Fork.

107.  American Fork's actions, including in particular its preferential treatment of certain entities, materially inhibits or limits the ability of UTOPIA and many private ISPs in Utah to compete in a fair, balanced, and non-discriminatory legal and regulatory environment.

108.  Defendants' actions violate section 253(a) of the TCA and are causing ongoing harm to UTOPIA and the private ISPs that it serves and should be invalidated or pre-empted.

109.  Defendants should be enjoined from continuing to exclude UTOPIA and private ISPs who wish to use UTOPIA's Network to provide telecommunications services to residents of American Fork.

## FOURTH CAUSE OF ACTION

**Violation of Utah Constitution Article I, Sec. 24 (Uniform Operation of Laws)**

110.  Plaintiff realleges and incorporates by reference the allegations set forth above

111.  Article I, Section 24 of the Utah Constitution commands that "All laws of a general nature shall have uniform operation."

112.  A law that appears uniform on its face still violates Article I, Section 24 of the Utah Constitution if that law does not operate, or is not applied, uniformly in practice.

113.  Chapter 12 of the American Fork Code governs use of American Fork streets for the installation of utility and other infrastructure.

114.  American Fork, Defendant Frost, and Defendant Bunker have not applied Chapter 12 of the American Fork Code uniformly.  Rather, they have singled UTOPIA out for extra, unwarranted scrutiny, terminated the UTOPIA ROW Agreement while entering into substantially identical franchise agreements with other fiber infrastructure providers; and refused to grant ROW permits for UTOPIA projects, while granting permits for similar fiber infrastructure projects.

### PRAYER FOR RELIEF

Wherefore, UTOPIA prays for judgment against Defendants as follows:

4850-8867-0718.v1

1.  That the Court render a final judgment in favor of UTOPIA and against American Fork on UTOPIA's First, Second, and Fourth Causes of Action;

2.  That the Court render a final judgment in favor of UTOPIA and against Defendants Bunker and Frost on UTOPIA's Third Cause of Action;

3.  That American Fork be ordered to pay over to UTOPIA all damages which UTOPIA has sustained as a consequence of the acts complained of herein, subject to proof at trial, together with prejudgment and post-judgment interest;

4.  That the Court enter an order declaring the discriminatory and preferential actions of Defendants Bunker and Frost against UTOPIA to be in violation of federal law, and preempted and unenforceable by Defendants.

5.  That the Court enter preliminary and permanent injunctive relief enjoining Defendants Bunker and Frost from continuing their discriminatory and preferential actions against UTOPIA.

6.  That UTOPIA be awarded such other and further relief as this Court may deem just.

DATED October 12, 2021.

/s/ Juliette P. White
Juliette P. White
PARSONS BEHLE & LATIMER

Attorneys for Plaintiff UTOPIA

4850-8867-0718.v1