Juliette P. White, USB #9616
Robert H. Hughes, USB #9787
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
ecf@parsonsbehle.com
jwhite@parsonsbehle.com

*Attorneys for Plaintiff UTOPIA*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTAH TELECOMMUNICATION OPEN INFRASTRUCTURE AGENCY, | **OPPOSITION TO MOTION TO DISMISS COMPLAINT** |
| Plaintiff, | Case No. 2:21-cv-00600 |
| vs. | Judge David Barlow |
| CITY OF AMERICAN FORK, DAVID BUNKER in his official capacity as American Fork City Administrator, and BRAD FROST in his official capacity as American Fork City Mayor | Magistrate Judge Daphne A. Oberg |
| Defendants. | |

## TABLE OF CONTENTS

I.      STATEMENT OF RELIEF SOUGHT ................................................................. 1

II.     STATEMENT OF ADDITIONAL RELEVANT FACTS ................................. 2

III.    ARGUMENT ................................................................................................. 3

    A.    UTOPIA Has Alleged a Viable Equitable Preemption Claim ............................... 4

        1.    UTOPIA Has Stated a Claim for Equitable Preemption under *Ex parte Young*, *Verizon Maryland*, and *Armstrong* ........................................ 5

        2.    UTOPIA's Equitable Preemption Claim Does Not Require the Equivalent of a Private Right of Action ...................................................... 7

        3.    Even if UTOPIA Must Identify a "Federal Right of Its Own to Vindicate," It Has Plausibly Alleged One Here ....................................... 11

            a.    UTOPIA Is a Telecommunications Service Provider Under the FTA ..............................................................................13

            b.    The Ruling in *Nixon* Does Not Cabin UTOPIA's Equitable Preemption Claim. ..........................................................15

    B.    American Fork's Local Legal Requirement Limiting Right of Way Access to Private Entities Is a Violation of Section 253(a) ................................ 19

    C.    This Court Should Retain Jurisdiction Over UTOPIA's State Law Claims ......... 23

        1.    The Court Should Retain Supplemental Jurisdiction over UTOPIA's State Law Claims ................................................................... 23

        2.    The Forum Selection Clause Is Unreasonable Because It Would Require UTOPIA To Litigate the Same Facts in Two Different Courts. ....................................................................................... 25

    D.    UTOPIA's Second and Fourth Causes of Action are Properly Pled ................... 26

        1.    UTOPIA Has Stated a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing. ............................................................ 27

        2.    UTOPIA Has Stated a Claim Under Utah's Uniform Operation of Laws Provision............................................................................. 28

a.      American Fork Incorrectly Imposes a Heightened Pleading
Standard on UTOPIA's Uniform Operation of Laws Claim .........28

b.      Even under American Fork's Inappropriately Heightened
Pleading Standard, UTOPIA's Complaint Clearly Alleges a
Violation of the Uniform Operation of Laws Provision. ...............31

IV.     REQUEST FOR LEAVE TO AMEND ........................................................................ 34

V.      CONCLUSION ................................................................................................................ 34

4886-9441-2048.v4

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320, (2015) .................................................................................. 4, 6, 7, 9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................. 3

*BancOklahoma Mortg. Corp. v. Capital Title Co., Inc.*,
   194 F.3d 1089 (10th Cir. 1999) ......................................................................... 25

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................. 4

*Bellsouth Telecommunications, LLC v. Louisville/Jefferson Cty. Metro Gov't*,
   No. 3:16-CV-124-TBR, 2016 WL 4030975 fn. 7 (W.D. Ky. July 26, 2016) ........................ 6, 9

*Boldt v. American Fork City*,
   2021 WL 5731587 (D. Utah 2021) ..................................................................... 29

*Carlsbad Technology, Inc. v. HIF Bio, Inc.*,
   556 U.S. 635 (2009) ........................................................................................... 24

*Carnegie–Mellon University v. Cohill*,
   484 U.S. 343 (1988) ........................................................................................... 24

*City of Austin v. Abbott*,
   385 F.Supp.3d 537 (W.D. Tex. 2019) ................................................................... 7

*City of Portland v. U.S.*,
   969 F.3d 1020 (9th Cir. 2020) ........................................................................... 22

*CNSP, Inc. v. City of Santa Fe*,
   755 F. App'x 845 (10th Cir. 2019) ............................................................... passim

*CNSP, Inc. v. Webber*,
   No. CV 17-0355 KG/SCY, 2020 WL 2745456 (D.N.M. May 27, 2020) ........................ passim

*Cox v. Cache County*,
   18 F.Supp.3d 1251 (D. Utah 2021) ..................................................................... 29

*Crown Castle Fiber LLC v. City of Charleston*,
   448 F.Supp.3d 532 (D. S.C. 2020) ..................................................................... 21

iii

*Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y.*,
No. 12-CV-6157 CS, 2013 WL 3357169 (S.D.N.Y. July 3, 2013) ......................................... 15

*Eggett v. Wasatch Energy Corp.*,
2004 UT 28 ............................................................................................................................ 27

*Electro-Mech. Corp. v. Riter Eng'g Co.*,
No. 2:10-CV-975 TS, 2011 WL 2118704 (D. Utah May 25, 2011)....................................... 25

*Salt Lake City Corporation v. Haik*,
2019 UT App. 4 ...................................................................................................................... 29

*Excell, Inc. v. Sterling Boiler & Mechanical, Inc.*,
106 F.3d 318 (10th Cir. 1997) ................................................................................................ 25

*Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*,
954 F.3d 118 (2d Cir. 2020)................................................................................................... 4, 7

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
841 F.3d 133 (2d Cir. 2016).................................................................................................. 6, 7

*Henderson v. National R.R. Passenger Corp.*,
412 Fed. Appx. 74 (10th Cir. 2011)....................................................................................... 24

In the Matter of Accelerating Wireline Broadband Deployment by Removing Barriers to
Infrastructure Inv.,
33 F.C.C. Rcd. 7706 (2018)................................................................................................... 22

*Kansas Penn Gaming, LLC v. Collins*,
656 F.3d 1210 (10th Cir. 2011) ................................................................................... 4, 29, 32

*Lee v. Gaufin*,
867 P.2d 572 (Utah 1993)...................................................................................................... 30

*Malan v. Lewis*,
693 P.2d 661 (Utah 1984).......................................................................................... 29, 30, 34

*Mohamad v. Palestinian Auth.*,
566 U.S. 449, 132 S. Ct. 1702, 182 L. Ed. 2d 720 (2012)..................................................... 16

*New Cingular Wireless PCS, LLC v. County of Marin California*,
2021 WL 662171 (N.D. Cal. Feb. 19, 2021) ........................................................................ 21

*Nixon v. Missouri Mun. League*,
541 U.S. 125 (2004).........................................................................................................passim

iv

*Prows v. Pinpoint Retail Sys., Inc.*,
    868 P.2d 809 (Utah 1993) ........................................................................... 25

*Qwest Corp. v. City of Santa Fe, New Mexico*,
    380 F.3d 1258 (10th Cir. 2004) ........................................................... passim

*Safe Streets All. v. Hickenlooper*,
    859 F.3d 865 (10th Cir. 2017) ............................................................. passim

*Salt Lake City Corporation v. Haik*,
    2019 UT App. 4 ........................................................................................ 29

*Spencer v. Utah State Bar*,
    2012 UT 92 .............................................................................................. 29

*St. Benedict's Dev. Co. v. St. Benedict's Hosp.*,
    811 P.2d 194 (Utah 1991) ..................................................................... 27, 28

*State Tax Commission v. Department of Finance*,
    576 P.2d 1297 (Utah 1978) ........................................................................ 32

*State v. Mohi*,
    901 P.2d 991 (Utah 1995) .......................................................................... 29

*TCG New York, Inc. v. City of White Plains*,
    305 F.3d 67 (2d Cir. 2002) ......................................................................... 20

*The Wilderness Soc. v. Kane Cty., Utah*,
    632 F.3d 1162 (10th Cir. 2011) .................................................................... 4

*Underground Const. Co. v. City & Cty. of San Francisco*, No. C,
    01-3707 MMC, 2002 WL 1585628 (N.D. Cal. July 15, 2002) ................................ 14

*United States v. Gonzales*,
    520 U.S. 1 (1997) ..................................................................................... 16

*United States v. Koerber*,
    10 F.4th 1083 (10th Cir. 2021) ..................................................................... 15

*Verizon Maryland Inc. v. Public Serv. Comm'n of Maryland*,
    535 U.S. 635 (2002) .......................................................................... passim

*Virgin Mobile USA, L.P. v. Pat Apple*,
    No. 17-CV-2524-JAR-JPO, 2018 WL 2926576 (D. Kan. June 7, 2018) .............. 5, 7

**Statutes**

28 U.S.C. § 1331 ................................................................................................................. 10, 23

28 U.S.C. § 1367 ................................................................................................................. 23, 25

28 U.S.C. § 1367(a) .................................................................................................................. 23

28 U.S.C. § 1367(c) .................................................................................................................. 24

28 U.S.C. § 1367(c)(3) .............................................................................................................. 25

47 U.S.C. § 153(50) .................................................................................................................. 14

47 U.S.C. § 153(53) ............................................................................................................. 13, 14

47 U.S.C. § 253(a) ............................................................................................................. passim

47 U.S.C. § 253(d) .................................................................................................................... 18

Article I, Section 24 of the Utah Constitution .......................................................... 26, 28, 29, 30

Utah Code Ann. § 11-13-203(1) ............................................................................................... 16

Utah Code Ann. § 11-13-203(2)(b) ........................................................................................... 16

## I.     <u>STATEMENT OF RELIEF SOUGHT</u>

UTOPIA and American Fork entered into an agreement allowing UTOPIA to build and operate its fiber optic Network in American Fork so that UTOPIA's customers—private Internet Service Providers—could serve the businesses and residents of American Fork. American Fork did not honor that agreement.  Instead, the City refused to grant permits to UTOPIA, terminated the agreement with UTOPIA, and prohibited UTOPIA from accessing the City's rights of way.

The City's actions constituted more than a mere breach of contract, and more than bad faith. American Fork violated—and *is violating*—the Federal Telecommunications Act ("FTA"):

> No … local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

47 U.S.C. § 253(a).

Why, after signing the franchise agreement with UTOPIA, would American Fork reverse course, breach the agreement, and prohibit UTOPIA from providing telecommunications services in violation of federal law? The answer seems to be that American Fork wanted to get into the telecommunications business itself, and compete directly with UTOPIA. It also appears that American Fork believes it can discriminate against any telecommunications services providers that are not private entities. But regardless of its motives, American Fork prohibited UTOPIA from operating in the City in violation of 47 U.S.C. § 253(a), and UTOPIA brought suit to enjoin that violation.

Defendants have moved to dismiss UTOPIA's complaint on multiple grounds. First, Defendants Bunker and Frost argue, incorrectly, that UTOPIA has no right to ask this Court to exercise its equitable powers to protect UTOPIA from Defendants' unlawful actions. In doing so,

1

Defendants fail to apprehend the actual requirements for alleging an equitable preemption claim under the FTA and misconstrue the nature of UTOPIA's business and the alleged violations at issue here. Tellingly, Defendants are unable to identify any relevant, controlling legal authority demonstrating that UTOPIA's equitable preemption cause of action should be dismissed.

American Fork also argues that UTOPIA's remaining state law claims should be dismissed for lack of jurisdiction or failure to state a claim. In every instance, American Forks' arguments are based on inapposite and unavailing case law and fail to establish that any of UTOPIA's causes of action are inadequately pled. Defendants' Motion to Dismiss should be denied.

## II.    STATEMENT OF ADDITIONAL RELEVANT FACTS

UTOPIA is an interlocal entity, independently created for the "specific purpose of financing, building, and operating the infrastructure and related facilities necessary to provide high-speed fiber-optic connections" through its Network. Compl. ¶ 9. UTOPIA's Network is available to all businesses on an "open-access basis," which means that UTOPIA does not discriminate among the providers that seek access to the Network to serve end-consumers. *Id*. ¶ 11. UTOPIA serves clients and customers throughout the State of Utah, either indirectly through contracts with private Internet Service Providers (ISPs), or directly to end-users. *Id*. ¶¶ 10-12. UTOPIA's competitors include companies like CenturyLink and Google—companies that have the capital to build and operate their own private fiber-optic networks. *Id*. ¶¶ 13-14. Through UTOPIA, smaller private ISPs can compete with the likes of CenturyLink and Google. *Id*. ¶¶ 19-20.

In April of 2018, American Fork entered into a franchise agreement with UTOPIA (the "ROW Agreement"), which allowed UTOPIA access to American Fork's rights of way for

2

purposes of building and operating its Network in the City. *Id*. ¶¶ 34-39. Over the next two years, UTOPIA submitted numerous permit applications seeking access to American Fork's rights of way for UTOPIA clients that wanted to provide service there. American Fork delayed decisions on those permit applications, submitted them to extra scrutiny, and eventually denied many of them. *Id*. ¶¶ 43-55. In July of 2020, American Fork notified UTOPIA that it was terminating the ROW Agreement and would refuse many of UTOPIA's then-pending permit applications. *Id*. ¶¶ 55-56. American Fork gave no reason for the denials or the termination, other than to explain that they were refusing to allow UTOPIA to construct or operate any portions of its Network within the city. *Id*. The local ordinances governing American Fork's permitting process gave the City virtually unfettered discretion to include or exclude whomever they wanted.  *Id*. ¶ 28.

American Fork employed its broad discretion to exclude UTOPIA in favor of private ISPs and the City itself, which wanted to charter its own, independent entity to compete with UTOPIA. *Id*. ¶¶ 84-87.  In doing so, American Fork prohibited UTOPIA (and the private ISPs that rely on UTOPIA's Network) from operating in American Fork, without providing any valid basis for doing so.  *Id*. ¶¶ 57-60.

## III.   <u>ARGUMENT</u>

The core question before this court is whether UTOPIA's complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A "claim is facially plausible if the plaintiff has pled factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (internal quotations and citations omitted). To survive a motion to dismiss, a complaint

or counterclaim must "offer sufficient factual allegations to 'raise a right to relief above the speculative level.'" *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). UTOPIA has set forth detailed factual allegations that easily satisfy this standard.

A. <u>**UTOPIA Has Alleged a Viable Equitable Preemption Claim**</u>

UTOPIA has alleged sufficient facts to support a cause of action for equitable preemption. Equitable preemption is a "judge-made remedy." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327, (2015). It describes the ability of a federal court, in certain circumstances, to "grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Id.* at 326. "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.* at 327; *see also CNSP, Inc. v. City of Santa Fe*, 755 F. App'x 845, 849 (10th Cir. 2019).

Equitable preemption is "a narrow but well-drawn line of precedent establishing that a plaintiff may invoke the court's equitable powers to enjoin a defendant from violating constitutional provisions that do not, themselves, grant any legal rights to private plaintiffs." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 133–34 (2d Cir. 2020). Although, as explained below, there are some constraints on the exercise of this power, the existence of "[a] federal statutory right or right of action is not" among them. *Qwest Corp. v. City of Santa Fe, New Mexico*, 380 F.3d 1258, 1266 (10th Cir. 2004); *accord The Wilderness Soc. v. Kane Cty., Utah*, 632 F.3d 1162, 1169 (10th Cir. 2011) ("Nor does there appear to be any requirement that the

preemptive federal statute create substantive rights in favor of a party arguing for preemption." (citing *Verizon Maryland Inc. v. Public Serv. Comm'n of Maryland*, 535 U.S. 635, 643-44 (2002)).

        1.      **UTOPIA Has Stated a Claim for Equitable Preemption under *Ex parte Young*, *Verizon Maryland*, and *Armstrong***

Whether a plausible equitable preemption claim has been pled is a "straightforward inquiry" that depends only on whether the "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md.*, 535 U.S. at 645 (internal quotations and citations omitted). And contrary to American Fork's apparent view, "the inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Id.* at 646.

UTOPIA alleges that American Fork, through the actions of defendants David Bunker and Brad Frost, has imposed an unlawful legal requirement on UTOPIA by terminating UTOPIA's ROW Agreement and refusing to allow UTOPIA to operate in American Fork—apparently on the belief that, among other reasons, they can discriminate against UTOPIA because the FTA only applies to private entities. UTOPIA seeks injunctive relief against this improper legal requirement on the grounds that it is preempted by the FTA.

UTOPIA is asking this court to exercise its equitable powers to protect UTOPIA from current, ongoing local government actions that are causing UTOPIA harm and that violate federal law. In short, UTOPIA invokes equitable preemption as a shield, not a sword. *See, e.g.*, *CNSP, Inc. v. Webber*, No. CV 17-0355 KG/SCY, 2020 WL 2745456, at *6 (D.N.M. May 27, 2020) ("It is significant that Plaintiff here seeks to use *Ex parte Young* as a shield in that it seeks injunctive relief, in contrast to the plaintiffs in *Armstrong* who sought affirmative relief in the form of additional payments."); *Virgin Mobile USA, L.P. v. Pat Apple*, No. 17-CV-2524-JAR-JPO, 2018

5

WL 2926576, at *4 (D. Kan. June 7, 2018) ("Here, Virgin Mobile wants the state officials to leave it alone, using *Ex parte Young* as a shield, rather than as a sword."); *Bellsouth Telecommunications, LLC v. Louisville/Jefferson Cty. Metro Gov't*, No. 3:16-CV-124-TBR, 2016 WL 4030975, at *7 fn. 7 (W.D. Ky. July 26, 2016) (same). This sort of defensive equitable preemption claim has long been recognized as viable in a multitude of contexts.

For example, in *Friends of the East Hampton Airport v. Town of East Hampton*, a group of aviation businesses that used the town airport sought an injunction against enforcement of local ordinances restricting operations at the public airport that were passed in violation of federal law. "In such circumstances, a plaintiff does not ask equity to create a remedy not authorized by the underlying law. Rather, it generally invokes equity preemptively to assert a defense that would be available to it in a state or local enforcement action." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016). Where plaintiffs are threatened with governmental action that violates federal law and seek only to enjoin enforcement of that action, "[s]uch a claim falls squarely within federal equity jurisdiction as recognized in *Ex parte Young* and its progeny." *Id.* at 144–45.

This cause of action is not limitless, however. When Congress expresses an "intent to foreclose" this equitable remedy, it is no longer available to private plaintiffs. *Armstrong*, 575 U.S. at 328; *see also Verizon Md.*, 535 U.S. 647; *CNSP, Inc. v. Webber*, No. CV 17-0355 KG/SCY, 2020 WL 2745456, at *6 (D.N.M. May 27, 2020) (noting that "[w]hile *Armstrong* clarified there is no implied right of action contained in the Supremacy Clause, the Supreme Court nevertheless allowed that parties may continue to pursue equitable preemption claims via *Ex parte Young* as long as the statute at issue has not foreclosed equitable relief").

6

Thus, the threshold question in an equitable preemption case is whether Congress has "displace[d] the equitable relief that is traditionally available to enforce federal law." *Armstrong*, 575 U.S. at 329. Defendants do not contend that Congress intended to foreclose equitable preemption claims under the FTA, and for good reason: the Supreme Court and many lower courts have already concluded otherwise. *See, e.g., Verizon Md.*, 535 U.S. 647 (allowing equitable preemption claim for alleged violations of section 252 of FTA); *Qwest*, 380 F.3d 1258 (considering plaintiff's equitable preemption claims under § 253); *CNSP, Inc. v. Webber*, 2020 WL 2745456 (same); *Virgin Mobile USA*, 2018 WL 2926576 (D. Kan.) (same); *City of Austin v. Abbott*, 385 F.Supp.3d 537 (W.D. Tex. 2019) (same).

### 2. UTOPIA's Equitable Preemption Claim Does Not Require the Equivalent of a Private Right of Action

According to American Fork, UTOPIA's equitable preemption claim should be dismissed because Congress did not affirmatively grant UTOPIA a "federal right of its own to vindicate" under the FTA. American Fork argues that an equitable preemption claim requires something more, namely, a "substantive federal right" akin to a private right of action. Under *Armstrong* and *Verizon Maryland*, that is simply untrue.

Both cases make very clear that a claim for equitable preemption does not depend on a private right of action. And in the wake of *Armstrong*, numerous courts have similarly concluded that equitable preemption causes of action such as UTOPIA's remain viable even without a private right of action. *See, e.g., Fed. Defs. of New York*, 954 F.3d at 133–34; *Friends of the E. Hampton Airport.*, 841 F.3d at 144–45; *see also CNSP, Inc. v. City of Santa Fe*, 755 F. App'x at 849 (noting that "the power of federal courts to enjoin state laws that violate federal law arises from 'the

creation of courts of equity'" and remanding for further consideration of equitable preemption claim under FTA).

In contending otherwise, American Fork relies solely on the Tenth Circuit's divided opinion in *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017), for the proposition that UTOPIA must identify a "substantive federal right." But that is distinguishable for several reasons. In *Safe Streets*, the plaintiffs were ordinary citizens, upset at Colorado's legalization of marijuana under state law despite the federal Controlled Substances Act. The state laws at issue did not govern the plaintiffs' conduct, restrict them, or require any action from them, and there was no threat of regulatory action looming over them. Rather, the plaintiffs sought a sweeping declaration preempting state law as though they were a citizen attorney general—a "free-floating cause[] of action in equity." *Safe Streets All.*, 859 F.3d at 894, 904 (in effect, a "citizen suit[] to vindicate the public's nonconcrete interest in the proper administration of the laws."). They were not asserting the sort of equitable preemption claim that UTOPIA asserts here, namely, a suit to enjoin a violation of federal law that is causing direct and ongoing harm.

Indeed, the majority in *Safe Streets* recognized that, where a plaintiff seeks an injunction restraining state officials from threatening or taking action against them, "a court need only conduct" the straightforward inquiry set forth in *Verizon Maryland. Safe Streets All.*, 859 F.3d at fn. 5 and fn. 19 ("Our discussion should not be understood to suggest that we have failed to account for this entirely separate species of claims."); *see also CNSP, Inc. v. Webber*, 2020 WL 2745456, at *8 ("Here, Plaintiff brings the exact claims *Safe Streets* exempted from its holding—that § 253 immunizes it from the City of Santa Fe enforcing the 2017 Ordinance against them."). That is

precisely the sort of equitable preemption claim that UTOPIA asserts here, and that is why *Safe Streets* does not control this Court's analysis.

Further, the *Safe Streets* majority appears to impose far more conditions on equitable preemption claims than *Armstrong* or *Verizon Maryland* contemplate. In laying out the contours of an equitable preemption claim, the *Safe Streets* majority adopted the Supreme Court's tests for determining whether a federal statute contain an implied *cause of action* or a *private right* under Section 1983. *Safe Streets All.*, 859 F.3d at 902-03. But equitable preemption claims are distinct from private rights of action, and the "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity," not Congress. *Armstrong*, 575 U.S. at 327; *see also Safe Streets All.*, 859 F.3d at 914 (Hartz, J., concurring in the judgment) ("In my view, however, *Armstrong* provides no support for the majority's requirement of a private right created by federal law."); *CNSP, Inc. v. City of Santa Fe*, 755 F. App'x at 849 at n.5 (recognizing Hartz's position in *Safe Streets*); *Bellsouth Telecomm.*, 2016 WL 4030975, at *3, 6 (noting disagreement with *Safe Streets*). As Judge Hartz put it in his *Safe Streets* concurrence, "I can find no language in *Armstrong* stating that the Court should 'first' (or ever, when examining the federal courts' equity power) concern itself with whether the party seeking injunctive relief alleged any federal substantive right." 859 F.3d at 916.

Rather than looking for evidence that Congress intended to *create* a private right of some sort, the Court in *Armstrong* looked only to determine whether Congress intended to *foreclose* the ability of a plaintiff to pursue this "judge-made remedy." The *Safe Streets* majority risks turning *Armstrong* on its head; rather than evaluating whether a statute forecloses a preexisting equitable remedy, as *Armstrong* requires, the majority asks whether the statute affirmatively gives the

plaintiff the right to sue. *Cf. Verizon Md.*, 535 U.S. at 642 ("For we agree with the parties' alternative contention, that even if § 252(e)(6) does not confer jurisdiction, it at least does not divest the district courts of their authority under 28 U.S.C. § 1331 to review the Commission's order for compliance with federal law.").

In *CNSP, Inc. v City of Santa Fe*, the Tenth Circuit noted that *Safe Streets* was a divided opinion and emphasized the panel's disagreement as to whether an equitable preemption claim could be conditioned on the existence of a federal substantive right. *CNSP, Inc. v. City of Santa Fe*, 755 F. App'x at 849 n.5. The district court's treatment of *Safe Streets* on remand further illustrates the point. A fiber optic network provider sued the City of Santa Fe, challenging certain ordinances and preferential actions by the city that, according to the plaintiff, violated Section 253 of the FTA. *CNSP, Inc. v. Webber*, 2020 WL 2745456, at *3. The district court made two key points for purposes of this discussion. First, the court observed that the plaintiff's equitable preemption claim was based on the FTA, like the claim asserted in *Verizon Maryland*. As such, it was distinguishable from the federal law at issue in *Safe Streets* (which even the majority in *Safe Streets* recognized). *Id.* at *8. Second, the court reasoned that the plaintiff's equitable preemption claim took the form of a shield and was, therefore, akin to the types of claims that the *Safe Streets* majority excluded from its decision. *Id*. For these reasons, the court concluded that neither *Armstrong* nor *Safe Streets* precluded the plaintiff's preemption claim. For the same reasons, UTOPIA's claim is not precluded.

Finally, there is a difference between a cause of action for equitable preemption and a cause of action for preemption under the FTA. American Fork purports to challenge whether UTOPIA can even bring an equitable preemption cause of action under the FTA (*i.e.*, whether UTOPIA has

a "substantive federal right"), but relies on case law directed at the merits of UTOPIA's underlying claims. Mot. at 10 (citing *Nixon v. Missouri Mun. League*, 541 U.S. 125 (2004) (analyzing whether a municipality qualifies as an "entity" under Section 253)). By conflating equitable preemption with a cause of action for preemption under the FTA, American Fork is imposing a merits-based analysis onto the threshold question of whether UTOPIA has alleged a plausible cause of action for equitable preemption. But "the inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Verizon Md.*, 535 U.S. at 646.

The Court in *Qwest* noted this distinction between equitable and regulatory preemption, and further observed that the existence of an equitable preemption claim does not depend on whether the statute itself expressly allows for preemption, just as it does not depend on the existence of an "implied private right of action [as] a means of enforcing the substantive provisions of a federal law." *Qwest Corp.*, 380 F.3d at 1266 ("The "mere coincidence" that the federal statute, here § 253, contains preemption language does not affect that distinction."). Clearly, given the ruling in *Qwest* and many other cases holding that plaintiffs may proceed with equitable preemption claims based on the FTA despite the lack of a private right of action, UTOPIA need not possess the sort of "substantive federal right" that American Fork now argues for.

### 3. Even if UTOPIA Must Identify a "Federal Right of Its Own to Vindicate," It Has Plausibly Alleged One Here.

Even if this Court concludes that some sort of affirmative "federal right" is required for UTOPIA to proceed, the contours of such a "federal right" (and what is required to plausibly allege such a right) remain unclear, even under *Safe Streets*. Defendants appear to contend that it must be the equivalent of a private right of action, and rely on case law governing that substantive

remedy in presenting their position. Critically, however, not a single case cited by Defendants actually imposes such requirements on a cause of action for equitable preemption.

To the extent the contours of this nebulous "federal right" can be determined, the *Safe Streets* majority provides limited guidance. For example, the majority observes that the plaintiffs in *Armstrong* were attempting "to vindicate their averred federal property rights to" Medicaid funds paid to them as service providers. *Safe Streets All*., 859 F.3d at 899. In other words, the plaintiffs in *Armstrong* had alleged that they possessed a "federal property right" in adequate reimbursement rates under Medicaid. The Supreme Court in *Armstrong* accepted those allegations without criticism or analysis, moving directly to answer the question of whether Congress had intended to foreclose equitable remedies for those plaintiffs. And the *Safe Streets* majority described the *Verizon Maryland* case as involving a "telecommunications company subject to State commission's order to pay reciprocal compensation charges seeking to vindicate federally recognized property rights by enjoining order." *Id*. at 905 fn.17. That is precisely what UTOPIA is doing here; alleging that it has the right to operate its Network in American Fork free from discrimination in violation of the FTA, just like any other telecommunications services provider.

And as explained below, American Fork fails to cite a single case holding that an entity like UTOPIA is barred from invoking the equitable powers of the federal courts to protect itself against actions taken by a local municipality in violation of the FTA. The authority upon which American Fork relies involves substantive causes of action in jurisdictions where courts have found a private right of action to enforce Section 253, or a direct petition to the FCC for a preemption determination. Assuming for the sake of this argument that some sort of affirmative

12

"federal right" is required, none of the authority cited by American Fork directly addresses that question, namely, how the nebulous requirements of *Safe Streets* actually apply to UTOPIA.

a.    UTOPIA Is a Telecommunications Service Provider Under the FTA

American Fork first argues that UTOPIA does not have a "federal right" under the FTA because it is not a telecommunications services provider. In doing so, American Fork characterizes UTOPIA as a construction company. American Fork not only misunderstands the nature and extent of UTOPIA's high-speed fiber optic Network, but also what makes an entity a "telecommunications service" provider under the FTA. The factual allegations in the Complaint, the plain language of the FTA, and the relevant case law establish that UTOPIA resides comfortably within the definition of "telecommunications service" provider.

Defendants selectively quote the FTA and omit a key clause in the definition of "Telecommunications Service": "the offering of telecommunications for a fee directly to the public, *or to such classes of users as to be effectively available to the public.*" 47 U.S.C. § 153(53) (emphasis added). That is one of the things that UTOPIA does; offering telecommunications for a fee to "such classes of users as to be effectively available to the public." UTOPIA finances, builds, *and operates* the infrastructure and related facilities necessary to provide high-speed fiber-optic connections directly to residences, businesses, and government agencies through contracts with third party internet service providers. Compl. ¶ 9. UTOPIA operates its Network on an open-access basis, allowing all ISPs equal access to the network on a nondiscriminatory basis. Compl. ¶ 11. It is a provider of "telecommunications services" because the Network that UTOPIA operates transmits information "between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received," to

13

residences in fifteen cities and businesses in over fifty Utah municipalities. 47 U.S.C. § 153(50) (defining telecommunications); *see also* Compl. ¶¶ 15, 16.

Notably, American Fork does not dispute that UTOPIA "holds itself out indiscriminately" to the public, or that UTOPIA offers its services to a class of "users as to be effectively available to the public." 47 U.S.C. § 153(53). Nor can it, given UTOPIA's allegation that its "Network is operated on an open-access basis, meaning that UTOPIA allows all private ISPs equal access to the Network on a non-discriminatory basis." Compl. ¶ 11. Rather, American Fork contends only that UTOPIA doesn't qualify because it is merely an "entit[y] that build[s] infrastructure for telecommunications providers;" in other words, a construction company. Mot. at 9-10. But UTOPIA isn't a construction company. For example, UTOPIA doesn't install conduit for itself or anyone else; UTOPIA contracts with construction companies to do the actual installation, as the ROW Agreement itself demonstrates. Compl. ¶ 40 ("the ROW Agreement provided that '. . . City shall issue a permit *to UTOPIA's contractor*, allowing said contractor to proceed with the work.'" (emphasis added)).

The unpublished decision in *Underground Construction v. City and County of San Francisco*, is of no assistance to American Fork's argument. In that case, a construction company that "installs underground utility facilities in the public rights-of-way in the City and County of Francisco for various entities, including those providing telecommunication services," brought a private right of action to enjoin a local ordinance that it alleged violated the FTA. The court found that Underground lacked standing to bring a cause of action under Section 253 because it was only a "construction company that installs conduit" and, therefore, was not within the "zone of interest" contemplated by Section 253. *Underground Const. Co. v. City & Cty. of San Francisco*, No. C 01-

3707 MMC, 2002 WL 1585628, at *1 (N.D. Cal. July 15, 2002).[1] By contrast, UTOPIA does not itself install conduit; it is the owner *and operator* of an open-access, high-speed fiber optic Network offering wholesale telecommunications services throughout the State of Utah. As such, UTOPIA qualifies as a telecommunications service provider under the FTA (if it must make that showing). After all, if UTOPIA were nothing more than a construction company that installs conduit, American Fork would have no need to view UTOPIA as a competitive threat to American Fork's ability to offer its own high speed internet services to the citizens of American Fork.

      b.      The Ruling in *Nixon* Does Not Cabin UTOPIA's Equitable Preemption Claim.

American Fork also argues that UTOPIA is precluded from bringing an equitable preemption claim because it is not an "entity" with a "federal right to vindicate" under the FTA. Mot. at 11 (citing *Nixon v. Missouri Mun. League*, 541 U.S. 125 (2004)). Again, American Fork seeks to impose unprecedented limitations on the ability of parties to bring equitable preemption claims, limitations that no court has ever imposed (other than, arguably, the *Safe Streets* majority): the existence of some sort of affirmative, substantive federal right. Even if this is required, American Fork's reliance on *Nixon* to establish the boundaries of that right cannot be sustained.

First, American Fork's position is inconsistent with Section 253(a)'s "plain text." *United States v. Koerber*, 10 F.4th 1083, 1112 (10th Cir. 2021) ("We first examine the statute's plain text. Absent ambiguity, our analysis ends there." (internal citation omitted)).  Second, the holding in

---

[1] Notably, American Fork does not argue that UTOPIA lacks standing to bring a claim under the FTA, which is understandable given that other courts have entertained causes of action asserted by entities offering services akin to UTOPIA without concluding they lack standing. *See, e.g., Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y.*, No. 12-CV-6157 CS, 2013 WL 3357169, at *1 (S.D.N.Y. July 3, 2013), aff'd, 552 F. App'x 47 (2d Cir. 2014) ("Plaintiff is a carrier's carrier that designs and installs fiber-optic based networks to improve wireless coverage and capacity."); *CNSP, Inc. v. City of Santa Fe*, 755 Fed.Appx.845 (10th Cir. 2019) (plaintiff installed "intrastate wireline Fiber Optic Networks" in Santa Fe's rights-of-way, described by the Court as "infrastructure").

4886-9441-2048.v4

*Nixon* is not so broad as American Fork contends and does not reach the question currently presented to this court.

Section 253(a) expressly bars American Fork from restricting UTOPIA's ability to provide telecommunication services:

> No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of *any entity* to provide any interstate or intrastate telecommunications service.

47 U.S.C.A. § 253(a) (emphasis added).

A word's plain meaning can typically be determined based on dictionary definitions. *See Mohamad v. Palestinian Auth.*, 566 U.S. 449, 454, 132 S. Ct. 1702, 1707, 182 L. Ed. 2d 720 (2012). "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind." *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)). The word "entity," in turn, means "an organization (as a business or governmental unit) that has an identity separate from those of its members." Merriam-Webster's Collegiate Dictionary 417 (11th ed. 2016); *see also* ENTITY, Black's Law Dictionary (11th ed. 2019) ("An organization (such as a business or a governmental unit) that has a legal identity apart from its members or owners").

UTOPIA undoubtedly falls within the plain meaning of the phrase "any entity." Under Utah law, UTOPIA is "[a]n interlocal entity" that is "separate from the public agencies that create it . . . ." Utah Code Ann. § 11-13-203(1) (emphasis added). And, "[t]he creation, operation, governance, and fiscal procedures of an interlocal entity and its governing authority are governed by this chapter and are not subject to the statutes applicable to its members or other entities." Utah Code Ann. § 11-13-203(2)(b). Under Utah law, UTOPIA exists as an independently chartered

16

"entity," classified as an organization with a political and corporate identity separate from those of its municipal members.

Despite acknowledging that UTOPIA is an entity, *see* Mot. at 11, the City insists that the Supreme Court has ruled that state political subdivisions do not fall within the phrase "any entity" for purposes of Section 253(a). Mot. at 10 (citing *Nixon*, 541 U.S. at 133 n.4 (2004)).

American Fork's argument misreads *Nixon*. It first goes astray by disregarding *Nixon's* narrow scope. The Supreme Court expressly declared that it "granted certiorari solely to consider whether *municipalities* are subsumed under the rubric 'any entity,' and our holding reaches only that question." *Nixon*, 541 U.S. at 136 n.4 (emphasis added). UTOPIA is not a municipality and is accordingly not within reach of the *Nixon* holding.

That the holding in *Nixon* does not extend to independently chartered entities like UTOPIA is further evidenced by the exclusion of such entities from both the FCC order at issue in *Nixon* and the Court's ruling. The FCC order suggested that "municipal utilities that had been separately chartered"—unlike the municipalities that brought the case—may be entitled to seek preemption. *Nixon*, 541 U.S. at 131 fn.2. Accordingly, the Supreme Court limited its holding solely to the types of municipalities before it and noted that "[t]he question whether § 253 preempts state and municipal regulation of these types of entities," namely, "municipally owned utilities . . . chartered as independent corporations, . . . is not before us, and we express no view as to its proper resolution." *Id*.

American Fork also errs by overlooking the reasoning behind *Nixon's* limited conclusion. The municipalities in *Nixon* were challenging a state statute prohibiting them from offering telecommunications services. The Court determined that the FTA should not be interpreted "so as

to affect the power of States and localities to restrict their own (or their political inferiors') delivery of such services." *Id*. at 128–29 (emphasis added). The Court was concerned that "preempting state or local governmental self-regulation (or regulation of political inferiors) would work so differently from preempting regulation of private players that we think it highly unlikely that Congress intended to set off on such uncertain adventures." *Id*. at 134 (emphasis added). And it emphasized that "the need to invoke our working assumption that federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power, in the absence of the plain statement [*Gregory v. Ashcroft*] requires." *Id*. at 140.

In other words, based on constitutional and policy concerns that are not present here, the Court determined that "any entity" could not be read to protect cities from restrictions on municipal powers imposed by state legislatures. The *Nixon* Court did *not* rule that one entity created under state law—like American Fork—could lawfully exclude another entity created under state law, especially not an independent entity specifically formed to provide telecommunications services— like UTOPIA. Yet that is exactly what American Fork is doing here.

Furthermore, *Nixon* did not involve an equitable preemption claim. The municipalities in that case had petitioned the FCC under Section 253(d) to declare the state laws preempted. Here, UTOPIA (not a municipality) is seeking injunctive relief from local legal requirements that violate Section 253(a) and that prohibit UTOPIA from exercising its lawful powers under state law. Thus, even if this court concludes that some sort of affirmative "federal right" is required to bring an equitable preemption claim, we know that it requires something less than a private right of action. After all, the Tenth Circuit already analyzed the issue and concluded that there was "no clear

manifestation of congressional intent to create a federal right through § 253." *Qwest Corp.*, 380

F.3d at 1266. And yet, courts in the Tenth Circuit and elsewhere continue to recognize the viability

of equitable preemption claims under Section 253. *See, e.g.*, *CNSP, Inc. v. Webber*, 2020 WL

2745456, at *8. And there is no case, including *Nixon*, that states the principle that American Fork

advances here, that this court cannot hear UTOPIA's equitable preemption claim at all.

The consequences of such a ruling would, in effect, prevent UTOPIA from ever obtaining

a decision on the merits. It would also prevent the private ISPs that contract with UTOPIA from

obtaining an answer as to whether they can effectively be barred from operating in American Fork

if they choose to use UTOPIA's Network. Whatever the scope of the affirmative "federal right"

that might be required, it should not be so limited as to effectively preclude relief for those that are

indisputably covered by the FTA and suffering direct, ongoing harm. In this context, it is important

to recall that the Supreme Court has repeatedly noted that the threshold analysis of whether a claim

lies for equitable preemption requires only "a straightforward inquiry into whether [the] complaint

alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."

*Verizon Md.*, 535 U.S. at 645. That is what UTOPIA presents here.

### B. American Fork's Local Legal Requirement Limiting Right of Way Access to Private Entities Is a Violation of Section 253(a)

American Fork's argument that UTOPIA fails to challenge a regulatory act is based on a

faulty premise—namely, that UTOPIA is only complaining about individual permitting decisions.

Not true. UTOPIA is challenging American Fork's prohibition of UTOPIA in its entirety on the

grounds that UTOPIA is not a private telecommunications service provider. American Fork's

exercise of unfettered discretion in denying UTOPIA's permits and cancelling the ROW

Agreement resulted in a complete prohibition on UTOPIA's provision of telecommunication

services. As such, American Fork's prohibition of non-private entities is subject to preemption under the FTA, 47 U.S.C. § 253(a), and should not be enforced against UTOPIA.

Defendants assert that UTOPIA is not challenging a local statute, regulation, or legal requirement. 47 U.S.C. § 253(a) ("No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."). But UTOPIA is challenging a "local legal requirement" — the unwritten legal requirement that only private entities are allowed to operate in American Fork.  The only difference between UTOPIA and the entities that have been granted franchise or right-of-way agreements with American Fork is that they are privately owned, and UTOPIA is not.

Moreover, American Fork's ability to implement its unwritten legal requirement is a result of the discretion afforded it by the American Fork Code, which broadly vests all authority over the uses of the public right-of-way in the discretion of the American Fork City Council:

> If, in the opinion of the council, placement of such facilities or systems is in the best interest of the city, and will be constructed and maintained without impairment to the health, safety and general welfare of the city residents, the council may authorize such construction subject to any conditions which it deems necessary to mitigate any adverse effects of such construction, and issue a permit therefor.

American Fork Code § 12.040.030(B). Ordinances that grant city officials "unfettered discretion" over right-of-way decisions are subject to preemption under the Telecommunications Act when they allow the city to prohibit the provision of services, just as American Fork has done here. *Qwest Corp.*, 380 F.3d at 1270 ("Such broad discretionary language has been repeatedly held to be prohibitive.") (citation omitted)); *see also TCG New York, Inc. v. City of White Plains*, 305 F.3d

67, 76 (2d Cir. 2002) ("In particular, the provision that gives the Common Council the right to reject any application based on any 'public interest factors ... that are deemed pertinent by the City' amounts to a right to prohibit providing telecommunications services . . ."). The regulatory structure employed by Defendants to scrutinize and delay UTOPIA's permit applications and ultimately cancel UTOPIA's ROW Agreement without explanation or justification "denies telecommunications providers the 'fair and balanced legal and regulatory environment' the TCA was designed to create." *Qwest Corp*, 380 F.3d at 1270. The result was to effectively, and permanently, prohibit UTOPIA from providing telecommunications services in American Fork. Such "free ranging discretion is objectionable" and should be preempted. *Id*. at 1271.

Defendants ignore the Tenth Circuit's controlling decision in *Quest Corp*., relying instead on case law from other jurisdictions that is easily distinguished. All of the cases cited by Defendants deal merely with a local jurisdiction's exercise of decision-making authority over requests from wireless providers to expand or modify their existing operations. None of the cases involve a complete prohibition on any entity's ability to operate, nor do they involve regulatory determinations like the categorical prohibition at issue here. *See, e.g., New Cingular Wireless PCS, LLC v. County of Marin California*, 2021 WL 662171 at *6 (N.D. Cal. Feb. 19, 2021) (holding that, unlike right-of-way decisions, county zoning decisions on private property are not regulatory in nature and therefore not considered legal requirements under section 253); *Crown Castle Fiber LLC v. City of Charleston*, 448 F.Supp.3d 532 (D. S.C. 2020) (declining to grant summary judgment to plaintiff alleging de facto moratorium based on city's refusal to act on permit applications). Unlike those cases, UTOPIA is challenging more than delayed permitting decisions

or unfavorable zoning decisions; UTOPIA is challenging American Fork's exercise of unfettered discretion to discriminate against UTOPIA and exclude it entirely from the city.

Further, even without American Fork Code § 12.040.030(B), the City of American Fork's unwritten prohibition on non-private entities constitutes a de facto moratorium on telecommunications services in violation of Section 253(a) of the Act. *See* In the Matter of Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Inv., 33 F.C.C. Rcd. 7706, 7779-783 (2018) ("FCC Order"); *see also City of Portland v. U.S.*, 969 F.3d 1020, 1045-46 (9th Cir. 2020) (upholding the FCC's decision regarding de facto moratorium). While the Tenth Circuit has not yet expressly adopted the FCC's definition of de facto moratoria, the FCC's reasoning is consistent with how the Tenth Circuit has approached other preemption challenges under the FTA. *See, e.g.*, *Quest Corp.*, 380 F.3d at 1271 fn.9 (noting that broad discretionary language in local ordinance "is undoubtedly prohibitive because the city can use it to outright deny leases to a telecommunications carrier.") Just as overly broad discretion is prohibitive, so too are unwritten rules regarding who can and cannot provide services.

UTOPIA has pled viable preemption claims based on both Defendants' use of unfettered discretion contained in American Fork Code § 12.040.030(B) as a means to prohibit UTOPIA from providing telecommunication services, and American Fork's unwritten legal requirement that only private entities may access its right-of-way. Defendants fail to cite any controlling authority demonstrating that UTOPIA's cause of action must be dismissed as a matter of law, and their motion must be denied.

**C.      This Court Should Retain Jurisdiction Over UTOPIA's State Law Claims**

American Fork does not contest the Court's jurisdiction under 28 U.S.C. § 1331 to decide the federal question raised by UTOPIA's Third Cause of Action. Nor does American Fork challenge the exercise of supplemental jurisdiction over UTOPIA's state law claims pursuant to 28 U.S.C. § 1367. Rather, American Fork argues (i) that if the Court dismisses UTOPIA's federal claim, the Court should also decline to exercise supplemental jurisdiction over the state law claims, and (ii) that a forum selection clause in the ROW Agreement requires the dismissal of UTOPIA's state law claims. American Fork is mistaken on both counts. The Court has considerable discretion to hear UTOPIA's state law claims and should exercise that discretion to retain jurisdiction over the entire dispute between UTOPIA and American Fork.

**1.      The Court Should Retain Supplemental Jurisdiction over UTOPIA's State Law Claims.**

Supplemental jurisdiction is governed by statute, which expresses the scope of supplemental jurisdiction in mandatory terms: "…in any civil action of which the district courts have original jurisdiction, the district courts *shall* have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy…." 28 U.S.C. § 1367(a) (emphasis added). American Fork tacitly concedes that UTOPIA's state law claims are part of the same controversy that gave rise to UTOPIA's equitable preemption claim under 47 U.S.C. § 253.

The jurisdictional mandate in § 1367(a) is subject to exceptions, but the exceptions are expressed in discretionary terms:

> The district courts *may* decline to exercise supplemental jurisdiction
> over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis added). American Fork does not assert that UTOPIA's state law claims are novel or complex, that they predominate over the federal claim, or that there are any other compelling reasons for the Court to decline jurisdiction. Instead, American Fork builds its entire argument on the third exception listed above—dismissal of the federal claims that provide the basis of supplemental jurisdiction.

But even assuming that this Court sides with American Fork and dismisses UTOPIA's claim for equitable preemption, that does not end the analysis. The Supreme Court has confirmed that retention of supplemental jurisdiction over state law claims is discretionary, even after the federal claim is dismissed: "A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 640 (2009);. In considering how to exercise that discretion, district courts must consider "the values of judicial economy, convenience, fairness, and comity…." *Henderson v. National R.R. Passenger Corp.*, 412 Fed. Appx. 74, 79 (10th Cir. 2011) (quoting *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350 (1988)).

American Fork's motion offers no substantive analysis of those factors, noting merely that the case is in its early stages. Mot. at 14. In fairness, there is not much else it could say at this point, given that the Court has not yet ruled on the underlying federal claim. Neither party has the

benefit of the Court's reasoning on the equitable preemption claim, which reasoning may be important in analyzing whether judicial economy (for instance) would be better served by litigating UTOPIA's state law claims in state or federal court. Perhaps it is no accident that 28 U.S.C. § 1367(c)(3) is phrased in the past tense, permitting courts to decline supplemental jurisdiction after "the district court has dismissed all claims over which it has original jurisdiction." Simply put, until the Court has actually ruled on UTOPIA's federal claim, American Fork's attack on supplemental jurisdiction over the related state law claims is premature.

      **2.     The Forum Selection Clause Is Unreasonable Because It Would Require UTOPIA To Litigate the Same Facts in Two Different Courts.**

As noted above, this Court has supplemental jurisdiction over UTOPIA's claims pursuant to 28 U.S.C. § 1367.  A court exercising supplemental jurisdiction must apply state substantive law to the claim.  *BancOklahoma Mortg. Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089, 1103 (10th Cir. 1999).

Utah courts will enforce valid forum selection clauses unless they are "unfair or unreasonable." *Prows v. Pinpoint Retail Sys., Inc.*, 868 P.2d 809, 812 (Utah 1993) (citation omitted).[2]  Courts have declined to enforce forum selection clauses where to do so would require the litigation of the same issues in different courts: "[r]equiring a bifurcated trial on the same issues contravenes the objective of modern procedure, which is to litigate all claims in one action if that is possible" *Id.* at 813; *see also Electro-Mech. Corp. v. Riter Eng'g Co.*, No. 2:10-CV-975 TS,

---

[2] American Fork cites to federal case law, *see* Motion at 15, but it makes no difference since state and federal law are aligned in holding that forum selection clauses are enforceable if they are fair and reasonable.  *See Excell, Inc. v. Sterling Boiler & Mechanical, Inc.*, 106 F.3d 318, 321 (10th Cir. 1997) (declining to decide whether state or federal law controlled interpretation of forum selection clause where there were no "material discrepancies" between Colorado and federal law).

2011 WL 2118704, at *4, 5 (D. Utah May 25, 2011) (declining to enforce a forum selection clause where its enforcement "would result in two nearly identical trials in separate courts and would violate the public policy of litigating all related claims in one action" and stating plaintiff "should be permitted to bring its action in a jurisdiction in which it can litigate all its claims at once").

In this case, it would be unreasonable to require UTOPIA to litigate its claims against American Fork in state and federal court simultaneously. UTOPIA has two claims that are arguably subject to the forum selection clause: breach of contract and breach of the covenant of good faith and fair dealing.[3] Those claims cannot be disentangled from UTOPIA's other claims. Evidence of American Fork's violation of the ROW Agreement supports UTOPIA's claims that American Fork prohibited UTOPIA from providing telecommunications service within American Fork in violation of 47 U.S.C. § 253, and that it discriminated against UTOPIA in violation of Article I, Section 24 of the Utah Constitution. Conversely, evidence that American Fork effectively prohibited UTOPIA from operating in the City (and evidence of discriminatory intent in doing so), supports UTOPIA's claim for breach of the covenant of good faith and fair dealing.

In short, UTOPIA's claims all arise from the same set of facts, and UTOPIA should be allowed to adduce those facts and pursue those claims in one forum.

### D.    UTOPIA's Second and Fourth Causes of Action are Properly Pled

American Fork further argues that two of UTOPIA's claims fail to provide the "short and plain statement" required by Rule 8. Mot. at 15. American Fork is incorrect. The Complaint spells

---

[3] American Fork does not specify which of UTOPIA's claims it believes are governed by the forum selection clause. *See* Mot. at 14-15 (referring generally to "state law claims").

out—in some detail—a plausible account that American Fork singled UTOPIA out from other telecommunications service providers and administered the ROW Agreement in bad faith.

### 1. UTOPIA Has Stated a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.

"An implied covenant of good faith and fair dealing inheres in every contract." *Eggett v. Wasatch Energy Corp*., 2004 UT 28, ¶ 14. "Under the [covenant], each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract." *St. Benedict's Dev. Co. v. St. Benedict's Hosp*., 811 P.2d 194, 199 (Utah 1991). A party breaches the covenant if its actions are inconsistent with "the agreed common purpose and the justified expectations of the other party." *Id*. at 200.

The Complaint alleges exactly such a breach. The common purpose of the ROW Agreement was to allow UTOPIA to install telecommunications facilities in American Fork streets, to serve customers in American Fork. *See* Compl. at ¶¶ 34-35. Accordingly, UTOPIA was justified in expecting that American Fork would issue permits for individual projects to serve that purpose, subject to conditions related to engineering matters. *Id*. at ¶¶ 31-33.

Instead, American Fork began to undermine the purpose of the ROW Agreement before the ink was even dry. *Id*. at ¶ 43 ("Almost immediately after the ROW Agreement was signed, American Fork subjected UTOPIA's permit applications to additional review and delay."). These delays were not based on engineering issues, but on American Fork's desire to do business "with another interested party that might be a better alternative for our residents as a whole." *Id*. at ¶ 65. As Defendant Bunker worked to set up a separate interlocal entity, LightHub, to compete with UTOPIA, *id*. at ¶ 84, he intentionally put an indefinite hold on UTOPIA's permit applications. *Id*.

at ¶ 50 ("And I still need to review the details for any UTOPIA permit.  So at this point we would not issue any permits for them.").

American Fork attempts to avoid this broader context and define UTOPIA's Second Cause of Action as limited to a handful of allegations that, according to American Fork, overlap with UTOPIA's breach of contract claim. *See* Mot. at 17 (focusing on ¶ 96 of the Complaint). But Complaints don't work that way. *See* Compl. at ¶ 94 ("Plaintiff realleges and incorporates by reference the allegations set forth above."). Taken as a whole, the Complaint tells a story that goes well beyond simple breach of contract. The Complaint alleges that American Fork was double-dealing—stringing UTOPIA along, dragging its feet on UTOPIA's permits, while all along planning to launch a direct competitor to UTOPIA. Allegations like these are sufficient to state a claim for breach of the covenant of good faith and fair dealing. *St. Benedict's Dev. Co*., 811 P.2d at 200 (reversing dismissal of claim where "hospital's encouragement of a competing office building suggests that there may have been a breach of the implied covenant of good faith and fair dealing.").

> **2.    UTOPIA Has Stated a Claim Under Utah's Uniform Operation of Laws Provision.**
>
>> a.    <u>American Fork Incorrectly Imposes a Heightened Pleading Standard on UTOPIA's Uniform Operation of Laws Claim</u>

American Fork argues that the UTOPIA's Complaint fails to adequately allege facts supporting a claim for relief under Article I, Section 24 of the Utah Constitution, which commands that "[a]ll laws of a general nature shall have uniform operation." Mot. at 18-22. In support of its argument, however, American Fork relies largely on case law interpreting the Equal Protection clause of the United States Constitution. That is wrong. The Utah Supreme Court has been clear

that "Utah's uniform operation of laws provision establishes different requirements than does the federal Equal Protection Clause." *State v. Mohi*, 901 P.2d 991, 997 (Utah 1995).

American Fork begins by citing to Utah cases for the uncontroversial proposition that Utah's Uniform Operations provision is similar to the Equal Protection clause. *See* Mot. at 19 (citing *Spencer v. Utah State Bar,* 2012 UT 92 and *Salt Lake City Corporation v. Haik,* 2019 UT App. 4). But then American Fork turns to federal case law interpreting the Equal Protection clause and attempts to export those Equal Protection concepts out of their proper context and apply them to UTOPIA's claim under the Utah constitution. *Id*. (citing *Cox v. Cache County,* 18 F.Supp.3d 1251 (D. Utah 2021), *Boldt v. American Fork City,* 2021 WL 5731587 (D. Utah 2021), and *Kan. Penn Gaming v. Collins*, 656 F.3d 1210 (10th Cir. 2011)). As noted above, the Utah Supreme Court has rejected the robotic application of federal Equal Protection precedent to the Uniform Operations clause: "…our construction and application of Article I, § 24 are not controlled by the federal courts' construction and application of the Equal Protection Clause." *Malan v. Lewis*, 693 P.2d 661, 670 (Utah 1984).

Understandably, American Fork may believe that federal Equal Protection case law applies to its defense against a Uniform Operations claim. After all, the City very recently convinced this Court of that proposition in another case where the City was accused of disparate treatment. *See generally*, *Boldt*, 2021 WL 5731587, *7 (applying Equal Protection analysis to "dismiss Plaintiffs' class-of-one equal protection claim under the Utah Constitution…"). The *Boldt* court cited a case from the Utah Court of Appeals as support for applying Equal Protection case law to a Uniform Operations claim. *See id*. at *11, citing *Haik*, 438 P.3d 913. But neither *Boldt* nor *Haik* addressed— let alone analyzed—the distinctions between Equal Protection and Uniform Operation. *See, e.g.*,

*Haik*, 438 P.2d at 926 (referring to plaintiff's "equal protection claim under Article I, Section 24 of the Utah Constitution.").

In any event, the last word on the Utah Constitution comes not from the Utah Court of Appeals or the federal courts, but from the Utah Supreme Court. And the Utah Supreme Court could not be more clear on this point— the Equal Protection and Uniform Operations clauses, while similar, are different in important ways:

> Although this provision is sometimes thought to have the same effect and impose the same legal standards on legislative action as the equal protection guarantee found in the Fourteenth Amendment to the United States Constitution, the language and history of the two provisions are entirely different, and even though there are important areas of overlap in the concepts embodied in the two provisions, the differences can produce different legal consequences.

*Lee v. Gaufin*, 867 P.2d 572, 577 (Utah 1993). Accordingly, American Fork's heavy reliance on the "class of one" analysis developed in *Cox* and *Kan. Penn Gaming* is misplaced. Both were Equal Protection cases; neither one involved or even addressed Utah's Uniform Operation provision.

Instead, the relevant inquiry is simply whether UTOPIA has plausibly alleged that it was singled out from others who were similarly situated based on a tenuous justification: "When persons are similarly situated, it is unconstitutional to single out one person or group of persons from among a larger class on the basis of a tenuous justification that has little or no merit." *Malan*, 693 P.2d at 671. UTOPIA's Complaint alleges exactly that, and more, as described below.

30

b.   Even under American Fork's Inappropriately Heightened Pleading Standard, UTOPIA's Complaint Clearly Alleges a Violation of the Uniform Operation of Laws Provision.

Even assuming for the sake of argument that American Fork's heightened pleading standard applies to UTOPIA's claim under the Utah Constitution, the allegations in UTOPIA's Complaint meet or exceed that standard.

First, UTOPIA alleges that it is in competition with certain, specific companies—including Xfinity, CenturyLink, and Google Fiber—to build networks that can be used to provide telecommunications services. Compl. at ¶ 13. The Complaint explains that UTOPIA and its competitors all need the same thing from American Fork: access to the City's public rights-of-way. *Id.* at ¶ 21. UTOPIA sought to secure that access by executing a franchise agreement with American Fork in 2018. *Id.* at ¶¶ 37-40. Likewise, the Complaint alleges that American Fork entered into agreements with specific companies—including CenturyLink and First Digital—that were "very similar, if not identical to, the ROW Agreement between UTOPIA and American Fork." *Id.* at ¶¶ 62-63. Finally, the Complaint puts it all together, alleging that American Fork has "singled UTOPIA out for extra, unwarranted scrutiny, terminated the UTOPIA ROW Agreement while entering into substantially identical franchise agreements with other fiber infrastructure providers; and refused to grant ROW permits for UTOPIA projects, while granting permits for similar fiber infrastructure projects." *Id.* at ¶114.

To be sure, UTOPIA is not identical to Google or Xfinity or CenturyLink. Google is a global behemoth, while UTOPIA is a small, local organization. Xfinity uses coaxial cable for its network, rather than fiber-optics. CenturyLink is a private company, while UTOPIA is an interlocal entity under Utah law. But even under the heightened pleading standard invoked by

American Fork, it is only *material* differences that matter. *See* Mot. at p. 20 (quoting *Kansas Penn Gaming,* 656 F.3d at 1218). And the differences described above are not material under Utah law.

For instance, the Utah Supreme Court has held that a law cannot single out one competitor in the insurance industry from the others on the sole basis that one is publicly administered while the others are private companies. In *State Tax Commission v. Department of Finance*, 576 P.2d 1297 (Utah 1978), the Utah Supreme Court found that a special 1% tax, imposed only on the State Insurance Fund, to be unconstitutional under the Uniform Operation clause:

> The State Insurance Fund has been singled out from among a larger class of insurers to pay a tax imposed upon no one else which must be considered to be arbitrary and constitutionally prohibited. … The only distinguishable feature is that the Fund is administered by a State agency, the cost therefor being paid from the premiums. This feature is not a rational basis to treat the Fund as a distinct classification.

*Id.* at 1298-99. Likewise, it would not be rational or constitutional for American Fork to single UTOPIA out from other telecommunications service providers on the basis that they are private companies, while UTOPIA is public entity.

In its Motion, American Fork offers only one distinction between UTOPIA and the firms that it gave preferential treatment to—those preferred companies offer internet service directly to customers, while UTOPIA generally builds the network and provides access to private internet service providers.[4] *See* Mot. at 20-21. But American Fork does not explain where it obtained the authority to favor telecommunications service providers who employ a retail model over those who employ a wholesale model. Nor does American Fork make any attempt to explain why that

---

[4] While this is "generally" UTOPIA's business model, it is not UTOPIA's exclusive business model.  *See* Compl. at ¶ 10.

distinction is material. In any event, American Fork's brief attempt to justify its discrimination against UTOPIA is a diversion into the merits of the case. At this point, the only question before the Court is the adequacy of UTOPIA's pleading. As explained by UTOPIA in the Complaint, the key similarity—the *material* similarity—between UTOPIA and others who received preferential treatment is that they all rely on access to American Fork's streets to conduct their business. In that respect, UTOPIA, Google, Xfinity, and CenturyLink are identically situated.

The Complaint also alleges that American Fork lacked a rational basis for its disparate treatment of UTOPIA. Again and again, as detailed in the Complaint, American Fork slowed down UTOPIA's permit applications for no discernable or articulated reason. *See, e.g.*, Compl., at ¶¶43-45. While it was becoming apparent that UTOPIA was being treated differently, the reason for that disparate treatment was never made clear. When UTOPIA's contractor asked City staff about a delayed permit, the response was only that "The permit application is being reviewed by our City Administrator, David Bunker. Please reach out to him concerning the status of your permit." *Id*. at ¶ 53. Moreover, Mr. Bunker's extra scrutiny had nothing to do with specific projects, but with UTOPIA in general: "All utopia permits need to be reviewed by George and I in the future." *Id*. at ¶ 49. Finally, the Complaint explains that when American Fork terminated the ROW Agreement, it offered no basis at all: "No reason for terminating the agreement was offered." Compl. at ¶56.

The Complaint also includes a number of detailed allegations suggesting that the real reason that American Fork singled UTOPIA out from the other fiber-optic providers was that American Fork was hoping to facilitate a different, competing fiber project. *Id*. at ¶¶ 65-87. Specifically, when a City Councilperson inquired about a delayed UTOPIA permit, the only explanation provided by the Mayor was that he and Defendant Bunker had "met with another

4886-9441-2048.v4

interested party that might be a better alternative for our residents as a whole." *Id*. at ¶ 65. But the underlying motivation for American Fork's disparate treatment of UTOPIA is not relevant at this stage of litigation. For purposes of American Fork's Motion, the important point is that the Complaint alleges that American Fork offered no justification at all for its disparate treatment of UTOPIA. *Id*. at ¶¶ 43-45, 49, 53, 56.

In short, the Complaint alleges what it must: that UTOPIA was singled out from others who were similarly situated, based on a tenuous and legally inadequate justification. *Malan*, 693 P.2d at 671 ("When persons are similarly situated, it is unconstitutional to single out one person or group of persons from among a larger class on the basis of a tenuous justification that has little or no merit.").

## IV.  REQUEST FOR LEAVE TO AMEND

Should this Court conclude that any of UTOPIA's causes of action are inadequately pled or require additional, or different factual allegations, UTOPIA respectfully requests that this Court afford it an opportunity to seek leave to amend its Complaint.

## V.  CONCLUSION

For all the foregoing reasons, Defendants' Motion to Dismiss should be denied.

DATED: February 28, 2022.

/s/ *Juliette P. White*
Juliette P. White
PARSONS BEHLE & LATIMER

*Attorneys for Plaintiff UTOPIA*

4886-9441-2048.v4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 28, 2022, a true and correct copy of the foregoing

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** was served via Court ECF Filing

to the following:

> David L. Mortensen
> dmortensen@foley.com
> Foley & Lardner LLP
> 299 South Main Street, Suite 2000
> Salt Lake City, UT 84111
>
> *Attorneys for Defendants City of American Fork, David Bunker, and Brad Frost*

> */s/ Juliette P. White*
> Juliette P. White
> PARSONS BEHLE & LATIMER
>
> *Attorneys for Plaintiff UTOPIA*

35

4886-9441-2048.v4